UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TETRA TECHNOLOGIES, INC.** | **CIVIL ACTION** |
| **VERSUS** | **No. 09-7491** |
| **LOUISIANA FRUIT COMPANY** | **SECTION I/2** |

## ORDER AND REASONS

Before the Court are motions for partial summary judgment filed by defendant, Louisiana Fruit Company ("LFC"),[1] and opposed by plaintiff, Tetra Technologies, Inc. ("Tetra"). Plaintiff has also filed motions for partial summary judgment,[2] which are opposed by defendant. For the following reasons, the motions are **GRANTED IN PART** and **DENIED IN PART**.

### *BACKGROUND*

LFC owns immovable waterfront property (Site #60) located in Venice, Louisiana which was leased to Tetra.[3] Site #60 measures approximately 600 feet along Tiger Pass which is bulkheaded.[4] Following damage to the bulkhead in 2004, Tetra filed for a declaratory judgment disputing its contractual obligations under the lease.[5] In August, 2008, LFC and Tetra entered into three mutually drafted agreements to resolve the legal dispute, rebuild the bulkhead, and enter into a new long-term lease: (1) Settlement Agreement, Receipt and Release ("Settlement

---

[1] R. Doc. Nos. 17, 18.
[2] R. Doc. Nos. 20-22.
[3] R. Doc. No. 31-1, ¶1; R. Doc. No. 27-1, ¶2.
[4] R. Doc. No. 26-1, ¶3.
[5] R. Doc. No. 27-1, ¶4.

1

Agreement"); (2) Agreement Regarding Construction of New Bulkhead Section ("Construction Agreement"); and (3) Lease.[6]

The Construction Agreement memorialized the parties' agreement to construct a new bulkhead section with both parties sharing in the cost of construction. The parties agreed in Clause 6:

> [Tetra] will be responsible for the project costs up to $1.2 M. LFC will be solely responsible for project cost over $1.2 M, up to $1.4 M. [Tetra] and [LFC] will each be responsible for fifty percent (50%) of the total actual project cost in excess of $1.4 M, provided [Tetra] will have approved in writing any expenditure that would cause the total project costs to exceed that amount.[7]

The project was let out for bid, and LFC and Tetra approved Rene Cross Construction's ("Rene Cross") bid of $1.877 million.[8] The parties subsequently signed an Escrow Agreement "for the purpose of providing a facility for funding and for disbursement of funds for the construction of bulkhead improvements at [Tetra]'s leased facility in Venice, Louisiana, pursuant to the terms of [the Construction Agreement]…"[9] The Addendum to the Escrow Agreement reiterated the scheme to divide costs as set forth in the Construction Agreement and Tetra approved acceptance of the bid for the entire work in the amount of $1.9 M.[10] The addendum confirmed that "at the point in time when the cumulative liability of LFC on incurred invoices totals $1.4 MM, Tetra will deposit an additional THREE HUNDRED THOUSAND ($300,000) DOLLARS into escrow."[11]

---

[6] *Id.* at ¶5.
[7] R. Doc. No. 21-5, ¶6.
[8] R. Doc. No. 27-1, ¶¶7-8.
[9] R. Doc. No. 22-8, p.1.
[10] R. Doc. No. 22-9, ¶2.
[11] *Id.* at ¶3.

In 2009, Rene Cross began construction of the new bulkhead.[12] In October 2009, approximately $1.0 million was due Rene Cross for work performed when the new bulkhead failed, apparently due to a defect in design or construction.[13][14] When the new bulkhead failed, a section of the existing bulkhead, (approximately 60 feet) also suffered damage due to the new bulkhead's failure.[15] Following the October 2009 failure, neither LFC nor Tetra repaired, replaced or removed the new or existing bulkhead and the Site 60 waterfront facility was not, therefore, fit for its intended use or occupancy.[16] On December 2, 2009, Tetra notified LFC by letter that Tetra was terminating the Lease.[17] On the same day, Tetra filed a complaint for declaratory relief.[18]

LFC has filed two motions for partial summary judgment. In its first motion, LFC contends that Tetra has additional obligations beyond payment of the $1.2 million already in escrow to rebuild the new bulkhead section.[19] In its second motion, LFC contends that Tetra has a contractual obligation under the Lease to repair the damaged existing bulkhead.[20] Tetra has opposed both of these motions.

Tetra has filed two cross-motions for partial summary judgments on the same issues. In its first cross-motion, Tetra seeks to "limit" and "cap" its obligation to fund the new bulkhead at 50% of total actual project costs incurred over $1.4 million, up to $1.9 million.[21] In its second

---

[12] R. Doc. No. 27-1, ¶10.
[13] *Id.* at ¶11; R.Doc. No. 34, p.3.
[14] At that point, "[a] substantial portion of the contract had not been completed at the time of the failure, namely, the installation of the rip rap (rock) to be placed on the water side of the bulkhead." R. Doc. No. 32-3, ¶10.
[15] R. Doc. No. 31-1, ¶3.
[16] *Id.* at ¶¶4-5.
[17] *Id.* at ¶6.
[18] R. Doc. No. 1.
[19] R. Doc. No. 17.
[20] R. Doc. No. 18.
[21] R. Doc. No. 21.

3

cross-motion, Tetra contends that it is not obligated under the Lease to repair the damaged existing bulkhead.[22]  LFC has opposed both of these motions.

Additionally, Tetra filed a related motion for partial summary judgment asking this Court to rule that it had properly terminated the Lease.[23]  LFC filed an opposition, but ultimately did not contest that Tetra had properly terminated the Lease.[24]  Accordingly, the Court need not discuss that issue.

## *LAW AND ANALYSIS*

**I.    STANDARD OF LAW**

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material

---

[22] R. Doc. No. 22.
[23] R. Doc. No. 20.
[24] R. Doc. No. 33.

facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

When exercising diversity jurisdiction over a question based upon state law, federal courts should apply the substantive law of that state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 72, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Contract law is an area of state law. *Doctor's Ass., Inc. v. Casarotto*, 517 U.S. 681, 686, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) ("States may regulate contracts ... under general contract law principles."). A lease is a contract that defines the respective rights and obligations of the lessor and lessee. *Frey v. Amoco Prod. Co.*, 603 So.2d 166, 172 (La. 1992). Leases are contracts and should be interpreted according to the customary principles of contract interpretation. *See Solo Serve Corp. v. Westowne Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991) (citing *Aguillard's Enters. Inc. v. Smith*, 439 So.2d 1158, 1160 (La. App. 4th Cir. 1983), *writ denied*, 444 So.2d 1224 (La. 1984)).

"Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court." *Amoco Prod. Co. v. Tx. Meridian Res. Exploration Inc.*, 180 F.3d 664, 668 (5th Cir. 1999). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "A contract provision is not ambiguous where only one of two competing

5

interpretations is reasonable or merely because one party can create a dispute in hindsight." *Amoco Prod.*, 180 F.3d at 668-69 (quoting *Tx. Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir.1998)) (internal quotation marks omitted). "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." Id. at 669.

## II.     NEW BULKHEAD

The issue the Court is asked to resolve relating to the costs associated with the new bulkhead is very narrow. Both parties agree that Tetra is liable for 50% of the "total actual project costs" incurred in excess of $1.4 million, up to $1.9 million, pursuant to the Construction Agreement.[25] [26] Furthermore, the parties agree that provisions of the Lease do not require Tetra to fund 100% of the construction of the new bulkhead.[27] The parties also agree that Tetra is only responsible for the "actual costs" of the project, which would not include any "re-design of the

---

[25] *See* R. Doc. No. 22, p.1 ("In this Motion, [Tetra] seeks an adjudication limiting its liability to 50% of the 'total actual costs' incurred for the construction of a new bulkhead section in excess of $1.4 million but 'up to' $1.9 million as agreed in writing pursuant to Clause 6 of [the Construction Agreement]."); R. Doc. No. 32, p.1 ("[LFC] suggests that Tetra is contractually obligated to pay its 50% share of the cost to construct the new bulkhead over $1.4M pursuant to the [Construction Agreement].").

[26] LFC argues that if this Court were to find that Tetra is not obligated to pay 50% of total actual costs between $1.4 million and $1.9 million, then the Court should alternatively find that the Settlement Agreement, Construction Agreement and Lease should be annulled based on mutual mistake. As there is no dispute with respect to whether Tetra is obligated to pay 50% of total actual costs between $1.4 million and $1.9 million, this Court need not address this argument.

[27] There was disagreement in the original motions as to whether Tetra was obligated to repair the new bulkhead at its sole cost pursuant to the Lease. However, subsequent oppositions and replies have made it clear that the parties are in agreement on this point. *See* R. Doc. No. 22, p.9 ("No obligation to 'repair' existed until 'after construction, inspection and acceptance' by [Tetra] (Lease Clause 6).") (emphasis omitted); R. Doc. No. 32, p.2 ("Tetra is not obligated to pay for the repairs to the New Bulkhead at Tetra's sole costs and expense pursuant to § 6 of the Lease.") (emphasis omitted).

project."[28]  Therefore, the only issue in dispute is whether Tetra should be liable for 50% of actual project costs in excess of $1.9 million.

Both parties agree that Clause 6 of the Construction Agreement is the provision governing Tetra's funding obligations.  The provision requires Tetra to approve in writing any expenditure over $1.4 million, and the parties agree that Tetra has provided written consent for project expenditures up to $1.9 million.  The disagreement arises over whether Tetra can withhold consent for actual project expenditures over $1.9 million.[29]  Tetra claims that the contractual language does not prohibit it from unilaterally or unreasonably refusing to approve project costs in writing in excess of $1.9 million, whereas LFC argues that Tetra's right to disapprove costs must be "reasonable based on the circumstances."[30]

Good faith performance is an implied requirement of every contract under Louisiana law.  La. Civ. Code art. 1983.  *See also Grisaffi v. Dillard Dept. Stores, Inc.*, 43 F.3d 982, 983(5th Cir. 1995).  However, "[t]he implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them." *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (citations omitted).  The Louisiana Civil Code does not define "good faith," but it does define "bad faith" as "an intentional and malicious failure to perform." La.Civ.Code Ann. art. 1997.  Louisiana law has equated "good faith" with the lack of "bad faith." *See, e.g., Great Southwest Fire Ins. Co. v. CNA Ins. Cos.*, 557 So.2d 966, 969 (La.1990); *Bond v. Broadway*, 607 So.2d 865, 867 (La.Ct.App.1992), *cert. denied*, 612 So.2d 88 (La.1993); *see also Commercial Nat'l Bank v.*

---

[28] *See* R. Doc. No. 39, p.2; R. Doc. No. 22-1, p.3.
[29] While the motions for both sides make no explicit mention of Tetra's withholding consent, this court interprets Tetra's motion to cap its liability at 50% of costs between $1.4 and $1.9 million as a clear withholding of consent.
[30] *See* R. Doc. No. 27, p.2; R. Doc. No. 32, p5.

*Audubon Meadow Partnership*, 566 So.2d 1136, 1139 (La.Ct.App.1990) (analyzing bad faith as the mirror image of good faith); *Heirs of Gremillion v. Rapides Parish Police Jury*, 493 So.2d 584, 587 (La.1986) (implying that a party has acted in good faith unless he has acted in bad faith).

The condition, "provided [Tetra] will have approved in writing any expenditure that would cause the total project costs to exceed that amount," found in Clause 6 of the Construction Agreement, unquestionably gives Tetra the authority to withhold consent. The only requirement is that the withholding must be in good faith. Since the interpretation of an unambiguous contract is an issue of law for the court, Tetra is within its contractual rights in withholding written consent to fund expenditures on the new bulkhead above $1.9 million as long as it does so in a manner that is not intentionally malicious.

In a footnote, LFC makes the claim that "[a]lthough the contract price was $1.877 million, Tetra verbally agreed to pay up to $2.0 million for the project."[31] Even though the Construction Agreement specifically conditions the additional funding on written approval, in Louisiana, "the law is clear that written construction contracts may be modified by oral contracts and the conduct of the parties even when the written contract contains a provision that change orders must be in writing." *Rhodes Steel Bldgs., Inc. v. Walker Const. Co.*, 813 So.2d 1171, 1177 (La.App. 2 Cir. 2002); *see also Wahlder v. Tiger Stop, Inc.*, 391 So.2d 535, 538 (La.App. 3 Cir. 1980) (oral modification upheld even though the written contract provided that modifications must be agreed to in writing to have validity.)

On issues of fact, however, the party seeking summary judgment always bears the initial responsibility of identifying those portions of the record that it believes demonstrate the absence of a

---

[31] R. Doc. No. 17-1, p.4 n.6.

genuine issue. *Celotex Corp.*, 477 U.S. at 323. LFC has made no such identification. LFC offers no affidavit or other evidence in support of its claim that Tetra orally consented to pay up to $2.0 million for the project. Accordingly, summary judgment in favor of LFC on this point is inappropriate.

### III.     EXISTING BULKHEAD

It is undisputed that the existing bulkhead failed in October, 2009, during the term of the Lease.[32] Therefore, the issue before the Court turns on the interpretation of provisions in the Lease. In its motions for summary judgment, LFC asserts that sections 6 and 8 of the Lease require Tetra to repair the existing bulkhead at Tetra's sole expense:

> Except as otherwise provided herein, deterioration or failure of the Existing Bulkhead during the term of this Lease…shall be repaired by [Tetra] at its sole cost and expense.[33]
>
> 8.1 Except as provided hereinafter, [Tetra] shall be responsible for repairing at its expense all damage to and deterioration of the Premises (including but not limited to the Existing Bulkhead…), occurring during the Lease Term hereof, ordinary wear and tear excepted.
> …
> 8.2(b)  If the periodic inspections are performed, and [Tetra] performs such Restoration Work as recommended by the consulting engineer during the Term of the Lease, then [Tetra] will not be required to make any other repair or reconstruction of the Existing Bulkhead…to the extent the necessity for such repair or reconstruction is attributable to bank erosion or riverbed scouring, inherent in the location.[34]

---

[32] R. Doc. No. 32-1, p.4.
[33] Section 6 of Lease. R. Doc. No. 21-4, p.5.
[34] Section 8.1 of Lease. R. Doc. No. 21-4, p.6

9

In opposition, Tetra argues that § 17 of the Lease relieves Tetra of this obligation to repair when the damage is such as to render the existing bulkhead unfit for occupancy:[35]

> In the event of damage to or destruction of any buildings, improvements, the Existing Bulkhead or the New Bulkhead Section constructed by or owned by [LFC] on the Premises to such an extent as to render the Premises unfit for occupancy, [LFC] shall have the option to restore, repair, replace, and rebuild same or alter same as nearly as possible to its condition immediately prior to such damage or destruction…If [LFC] elects not to restore, repair or replace the Premises, [Tetra] may at its option make such repairs as [Tetra] deems appropriate, or terminate the Lease.[36]

In Louisiana, "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046; *First Nat. Bank of Commerce v. City of New Orleans*, 555 So.2d 1345, 1348 (La. 1990). "A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage." *Lambert v. Maryland Casualty Company*, 418 So.2d 553, 559 (La.1982).

Sections 6 and 8 of the Lease are unambiguous in their meaning and structure: unless otherwise excepted, Tetra is generally responsible at its own expense for repairing any deterioration, failure or damage to the existing bulkhead that occurs during the term of the Lease. Section 8 contains two such specific exceptions, for "ordinary wear and tear" and "bank erosion

---

[35] *See* R. Doc. No. 21-1, p.5.
[36] Section 17 of Lease. R. Doc. No. 21-4, p.13.

10

or riverbed scouring."[37]  Considering the specific language used in § 17 and then viewing the Lease agreement as a whole, it is clear that § 17 represents another exception to Tetra's general duty to repair.

The key sentence of § 17 reads, "[i]f [LFC] elects to not restore, repair or replace the Premises, [Tetra] may at its option make such repairs as [Tetra] deems appropriate, **or** terminate the Lease" (emphasis added).  The disjunctive structure of the sentence means that the two options are mutually exclusive.  The use of the word "or" invalidates any interpretation that would require Tetra to make repairs once it has elected to terminate the Lease.  If Tetra had a continuing obligation to repair even if it elected to terminate the Lease, the contract language would not have included the phrase "at its option" nor would it have included the word "or."  In the event of damage by casualty, an election by LFC not to "restore, repair or replace," and a decision by Tetra to terminate the Lease, the language of § 17 did not intend to require Tetra also to repair.  This intent carries with it an inherent logic: if damage occurs and the premises are rendered unfit for occupancy, nobody should be required to pay for repair after the lessor and the lessee both have elected not to repair.

Moreover, considering the Lease agreement as whole, the very existence of § 17 evinces an intent to create an exception to Tetra's general duty to repair.  If Tetra were responsible for repairs regardless of whether it chose to terminate the Lease, as argued by LFC, § 17 would be unnecessary.  LFC's option to repair would be superfluous because Tetra would already be obligated under §§ 6 and 8 to repair any damage by casualty that wasn't caused by ordinary wear and tear, erosion or riverbed scouring.  This Court seeks to give practical effect to all parts of the

---

[37] LFC states, and Tetra does not dispute, that the existing bulkhead did not fail due to ordinary wear and tear, or erosion or scouring. *See* R. Doc. No. 18-1, p.6.

contract. *Lambert*, 418 So.2d at 559. The only way § 17 retains a purpose is if it creates an exception to §§ 6 and 8, whereby in the event of casualty damage, LFC has an option to repair or else Tetra will have the option to terminate the Lease without repairing.

LFC argues that "the purpose of § 17 is to address the right to 'terminate' the Lease, not the obligation to 'repair.' "[38] LFC points to the absence of any language regarding financial responsibility as evidence that § 17 is purely a provision laying out Tetra's termination rights and not a release from liability for repair. This argument is rebutted by the fact that § 17 is entitled, "Damage by Casualty" and not "Termination." "Casualty" is defined as "[a] person or thing injured, lost, or destroyed." BLACK'S LAW DICTIONARY, 247 (2009). The heading supports the Court's conclusion that the parties intended to create a specific set of obligations that would apply in the event that the Premises were "unfit for occupancy." Termination of the Lease is merely one of several possible outcomes if the circumstances of casualty came to bear, not the singular purpose of the entire section.

The intention to create a special regime of obligations in the event of damage by casualty is supported by the first mention of LFC's option to repair in § 17. Sections 6 and 8 only express that Tetra has a responsibility to repair; there is no mention of LFC's contractual rights or obligations. Section 17's introduction of LFC's option to repair and LFC's duty to notify emphasizes that the parties viewed damage by casualty as a special circumstance over which a different set of contract provisions governed.

When the clear and explicit language of § 17 is considered along with the structural factors in the Lease, this Court finds that the contractual obligations under the Lease are unambiguous: Tetra is not obligated under the Lease to repair the existing bulkhead.

---

[38] R. Doc. No. 18-1, p.9.

**IV.     CONCLUSION**

Accordingly,

**IT IS ORDERED** that defendant's motion[39] for partial summary judgment regarding the new bulkhead is **GRANTED** in that Tetra does have obligations beyond the payment of $1.2 million.

**IT IS FURTHER ORDERED** that plaintiff's motion[40] for partial summary judgment regarding the new bulkhead is **GRANTED** in that Tetra's has only agreed to fund total actual project costs incurred over $1.4 million at 50%, up to $1.9 million.

**IT IS FURTHER ORDERED** that defendant's motion[41] for partial summary judgment regarding the existing bulkhead is **DENIED** and plaintiff's motion[42] for partial summary judgment is **GRANTED** in that Tetra is not obligated to pay for repair of the existing bulkhead.

**IT IS FURTHER ORDERED** that plaintiff's motion[43] for partial summary judgment regarding lease termination is **GRANTED**.

New Orleans, Louisiana, September 29, 2010.

_____
LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE

---

[39] R. Doc. No. 17.
[40] R. Doc. No. 22.
[41] R. Doc. No. 18.
[42] R. Doc. No. 21.
[43] R. Doc. No. 20.